COHN LIFLAND PEARLMAN
  HERRMANN & KNOPF LLP
PETER S. PEARLMAN
Park 80 Plaza – West One
250 Pehle Avenue, Suite 401
Saddle Brook, NJ 07663
Telephone:  201/845-9600
201/845-9423 (fax)
psp@njlawfirm.com

Attorneys for Plaintiffs

[Additional counsel appear on signature page.]

## UNITED STATES DISTRICT COURT

## DISTRICT OF NEW JERSEY

| | |
|---|---|
| In re JOHNSON & JOHNSON FCPA SHAREHOLDER DERIVATIVE LITIGATION | ) ) ) ) |
| | ) |
| This Document Relates To: | ) ) |
| ALL ACTIONS. | ) ) ) |
| | ) |

Master File No.
  3:11-cv-02511-FLW-TJB

CONSOLIDATED VERIFIED
SHAREHOLDERS DERIVATIVE
COMPLAINT FOR BREACH OF
FIDUCIARY DUTY,
MISMANAGEMENT, ABUSE OF
CONTROL, CORPORATE WASTE,
UNJUST ENRICHMENT AND
VIOLATIONS OF THE FEDERAL
SECURITIES LAWS


<u>DEMAND FOR JURY TRIAL</u>

645771_1

## PREAMBLE

"*Corruption was, in effect, a company policy . . . [and the] corruption was systemic and long-term . . . .*" Mr. Justice Bean, of the Southwark Crown Court in London, April 14, 2010.

"'*Today, Johnson & Johnson has admitted that its subsidiaries, employees, and agents paid bribes to publicly-employed health care providers in Greece, Poland and Romania, and that kickbacks were paid on behalf of Johnson & Johnson subsidiary companies to the former government of Iraq under the United Nations Oil for Food program*. . . .'" Mythili Raman, Principal Deputy Assistant Attorney General of the Justice Department's Criminal Division, April 8, 2011.

"'*J&J chose profit margins over compliance with the law by acquiring a private company for the purpose of paying bribes, and using sham contracts, off-shore companies, and slush funds to cover its tracks*.'" Robert Khuzami, Director of Enforcement, United States Securities and Exchange Commission, April 7, 2011.

## OVERVIEW OF THE ACTION

1.    By this action, plaintiffs Sandra Wollman ("Wollman"), residing at 5400 Vantage Point Road, Apt. 615, Columbia, Maryland 21044, Gila Heimowitz ("Heimowitz"), residing at 74 Longacre Avenue, Woodmere, New York 11598, Joseph Cafaro ("Cafaro"), residing at 207 Bromely Circle, New Smyrna Beach, Florida 32168 and Cynthia Diamond ("Diamond"), residing at 2005 Greenwood Avenue, San Carlos, California 94070 (together, "plaintiffs") seek to recover damages and equitable relief for nominal defendant Johnson & Johnson ("J&J" or the "Company"), against its Board of Directors for breach of fiduciary duty, mismanagement, abuse of control, corporate waste, unjust enrichment and violations of the federal securities laws.

- 1 -

2.      Defendants are Mary Sue Coleman ("Coleman"), James G. Cullen ("Cullen"), Ian E. L. Davis ("Davis"), Michael M.E. Johns ("Johns"), Susan L. Lindquist ("Lindquist"), Anne M. Mulcahy ("Mulcahy"), Leo F. Mullin ("Mullin"), William D. Perez ("Perez"), Charles Prince ("Prince"), David Satcher ("Satcher") and William C. Weldon ("Weldon") (together, "defendants" or the "J&J Board").

3.      The directors of a New Jersey corporation are responsible for managing its business and owe the corporation an unremitting duty of loyalty.  Because of this, directors are responsible for managing the corporation lawfully and in accordance with the laws applicable to its business.  Here, when faced with a known duty to act, *i.e.*, ensuring J&J's compliance with the Foreign Corrupt Practices Act ("FCPA") at its overseas operations, defendants breached their duty of loyalty by failing to cause J&J to implement an internal controls system for detecting and preventing bribes to public doctors and administrators in Greece, Poland and Romania, and kickbacks to officials in Iraq to win business there.  As a result, defendants may be held liable to the Company for damages, which, to date, exceed $70 million.

4.      The J&J Board will not commence litigation against defendants, let alone vigorously prosecute such claims, because they face a substantial likelihood of liability to J&J for failing to implement controls for compliance with the FCPA at J&J's subsidiaries in Greece, Poland and Romania, as detailed herein.  Accordingly, a pre-suit demand upon the J&J Board is a useless and futile act, and plaintiffs may bring this action to vindicate J&J's rights against its wayward fiduciaries.

- 2 -

5.     Moreover, the Board has stated publicly its intention to reject the causes of action brought by the plaintiffs on the Company's behalf.  The Board's rejection of the claims based on a report by a Special Committee (the "Special Committee") was wrongful for three overarching reasons.  First, the Special Committee members suffer debilitating conflict of interests that affected their decision.  Second, the investigation by the Special Committee was not conducted in good faith, and as a result, the Special Committee's report was flawed and incomplete.  And third, the Special Committee's decision to reject the claims was unreasonable because it deliberately skirted addressing the breach of loyalty claims asserted in the Complaint in favor of knocking down strawman claims.

6.     Accordingly, plaintiffs should be permitted to bring this action to vindicate J&J's rights against its wayward fiduciaries.

## SUMMARY OF THE ALLEGATIONS

7.     J&J is a multi-national consumer products, pharmaceutical and medial devices company.  At all relevant times, the Company operated extensively in Greece, Poland and Romania through wholly owned subsidiaries.  These subsidiaries regularly worked with public doctors and administrators affiliated with state-run hospital systems.  J&J also competed for lucrative contracts to provide goods to Iraq under the United Nations' Oil-for-Food program.

8.     Due to its overseas operations, J&J is subject to the FCPA.  The FCPA bars publicly traded companies from bribing officials in other countries to get or retain

- 3 -

business; it also requires publicly traded companies to implement rigorous internal controls systems to detect and prevent bribes and kickbacks.  Since even before the terrorist attacks of September 11, 2001, and with even more vigor thereafter, the enforcement of the FCPA has been a well-publicized, top priority of the U.S. Government.

**J&J's Foreign Bribery Scheme**

9.     On April 7, 2011, J&J shareholders learned for the first time that J&J has engaged in a widespread scheme to bribe doctors in Europe and pay kickbacks to officials in Iraq in order win contracts to sell drugs, artificial joints and other products. According to the United States Securities and Exchange Commission ("SEC"), J&J violated the FCPA because the Company "failed to implement internal controls to detect or prevent bribery."

10.     According to SEC enforcement director, Robert Khuzami, "'J&J chose profit margins over compliance.'"  As a result, J&J paid bribes to public doctors in Greece who selected J&J surgical implants for their patients.  J&J paid bribes to doctors and public hospital administrators in Poland who awarded lucrative tenders (contracts) to J&J.  J&J paid bribes to public doctors in Romania to prescribe J&J pharmaceutical products.  And, J&J paid kickbacks to officials in Iraq to win 19 contracts under the United Nations' Oil-for-Food program.

11.     Moreover, J&J used fake contracts and phony companies to deliver the bribes, which were mischaracterized as legitimate "commissions" in J&J's accounting

records.  These phony companies, fake contracts and phony descriptions were created and adopted for the purpose of – and had the intended effect of – helping conceal the illicit payments from J&J shareholders and regulators alike.

12.     In total, J&J earned over $24 million in profits by bribing Greek doctors to buy surgical implants.  The Company earned $4.3 million in Poland as a result of bribes, and another $3.5 million through illegal rewards in Romania.  J&J also made $6.1 million in profits by paying kickbacks to officials in Iraq to win business there.

13.     Based on this evidence, the SEC concluded that J&J had, in fact, violated the FCPA's books and records provisions at its operations in Greece, Poland, Romania and Iraq.  The SEC reached this conclusion after conducting an extensive, multi-year investigation, in conjunction with the United States Department of Justice ("DOJ"), into J&J's compliance with the FCPA.  That investigation involved a through review of J&J's non-public books and records, witness interviews and other materials and sources.

**J&J Conceals Its FCPA Violations from Shareholders**

14.     J&J purportedly self-reported its violations of the FCPA in Greece and Poland to U.S. authorities in February 2007.  However, the Company's disclosure regarding its violations in Poland came only *after* Polish authorities had informed J&J that they were investigating the Company's payment of bribes to Polish public officials.  Moreover, the Company's self-disclosure *did not* include its violations of the FCPA based on the bribes in Romania or its kickbacks to officials in Iraq.

- 5 -

15.     Further, from when J&J purportedly self-reported some of the violations until early 2011, J&J never disclosed to J&J shareholders the details regarding the Company's widespread bribery of doctors in Europe and kickbacks to officials in Iraq. Instead, in J&J's shareholder reports issued between mid-2007 and March 2011, defendants merely acknowledged the existence of the on-going FCPA investigations and described some of the remedies available to the SEC and DOJ for violations of the FCPA.

16.     Defendants, and each of them, signed one or more of J&J's false and misleading 2006-2010 Annual Reports on SEC Form 10-K and false and misleading 2007-2011 Proxy Statements on SEC Form DEF 14 and caused them to be disseminated to J&J shareholders, as detailed in ¶¶71-83.  In doing so, defendants breached their fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws.

**J&J's FCPA Settlement – the Tenth-Largest Ever**

17.     J&J's frankly breathtaking violations of the FCPA remained concealed from J&J shareholders until early April 2011.  Then, on April 7-8, 2011, the SEC and DOJ announced that J&J had resolved federal FCPA enforcement actions against the Company by admitting to engaging in a scheme to bribe doctors in Europe and pay kickbacks to officials in Iraq.  The U.S. Government also revealed that J&J had agreed to pay $70 million in disgorgement, interest and fines, in addition to entering into a

- 6 -

deferred prosecution agreement with the DOJ entailing substantial additional costs to the Company.

18.     In particular, J&J agreed to pay $48.6 million in disgorgement and interest to settle the SEC claims and a $21.4 million fine to settle charges brought by the DOJ.  Under the deferred prosecution agreement, J&J admitted to bribing doctors in Europe and agreed to report on remediation and compliance measures every six months for three years.

19.     According to press reports, J&J's FCPA settlement is the tenth-largest settlement of its type, and the second-largest FCPA settlement involving a U.S. corporation.  Regardless of its ranking, defendants' conscious failure to cause J&J to implement an internal controls system to detect and prevent bribery has severely damaged J&J and its business, goodwill and reputation.  The Company has and is likely to suffer additional damages while remediating the compliance violations discovered at the Company by the SEC and DOJ.

20.     While defendants claimed on April 8, 2011 that the $70 million in FCPA settlements "'are not representative of Johnson & Johnson employees around the world who do what is honest and right every day,'" the judge in London who oversaw the corruption trial of a former J&J executive thought otherwise.  Mr. Justice Bean said:

"Corruption was, in effect, a company policy pre-dating your involvement and approved by your superiors. . . . [I]t is likely to have involved the knowledge, consent and participation of individuals with senior responsibilities in the group of companies in which you worked. . . . But it does not justify a suspended sentence in a case where corruption was systemic and long-term and involved several million pounds in corrupt payments."

## The J&J Board's Liability

21.     As J&J's directors, the responsibility for causing J&J to implement the FCPA rests with defendants.  However, despite a known duty to act, *i.e.*, causing J&J to implement FCPA-compliant internal controls at its operations in Greece, Poland, Romania and Iraq, defendants consciously failed to act, *i.e.*, failed to implement FCPA-compliant internal controls, with disastrous consequences for J&J.  Defendants are therefore liable to J&J for all damages arising from their breach of fiduciary duty, mismanagement, abuse of control, corporate waste, unjust enrichment and violations of the federal securities laws.

22.     Unlike regular J&J shareholders, defendants for the past several years have had complete and unfettered access to the facts surrounding J&J's violations of the FCPA.  As J&J acknowledges, a random inquiry uncovered facts suggesting corruption at J&J's subsidiaries in Europe.  As the inquiry grew into a wider internal investigation, and ultimately into the SEC and DOJ federal investigation into J&J's compliances with the FCPA, defendants learned additional facts about the Company's bribery of officials.

- 8 -

23.     Nevertheless, the J&J Board has not commenced legal action against persons responsible for the FCPA compliance debacle at J&J: (i) namely defendants Coleman, Cullen, Johns, Lindquist, Mullin, Prince, Satcher and Weldon for failing to implement internal controls to detect and prevent bribery at J&J's operations in Greece, Poland, Romania and Iraq, in breach of their fiduciary duty of loyalty to ensure J&J's compliance with the FCPA's books and records provisions; and (ii) defendants Coleman, Cullen, Davis, Johns, Lindquist, Mulcahy, Mullin, Perez, Prince, Satcher and Weldon for serially withholding adverse, material non-public information regarding J&J's FCPA violations from J&J shareholders, in breach of their fiduciary duty of loyalty and candor, and in violation of the federal securities laws.  The J&J Board is not even willing to commence legal actions against two officers that were found to have been participants in the violations of the FCPA.

24.     Defendants have also been unjustly enriched in light of the huge foreign bribery scheme that occurred at J&J on their watch.  That scheme has damaged J&J and arose due to defendants' mismanagement of, and abuse of their control positions at, J&J.

25.     Absent this shareholders derivative action, J&J's rights against its wayward fiduciaries will not be vindicated, because the J&J Board suffers disabling conflicts of interests that preclude them from controlling the Company's derivative claims against defendants.  Plaintiffs, by contrast, will adequately protect J&J's

interests, and on that basis seek relief for J&J by way of this shareholders derivative action.

## JURISDICTION AND VENUE

26.    This Court has jurisdiction over this action under 28 U.S.C. §1331, because the claims asserted arise under §§14(a) and 29(b) of the Securities Exchange Act of 1934 ("Exchange Act"), 15 U.S.C. §§78n(a) and 78cc(b).  The Court has supplemental jurisdiction over the non-federal claims asserted herein under 28 U.S.C. §1367(a).

27.    This action is not a collusive action designed to confer jurisdiction on a court of the United States that it would not otherwise have.

28.    This Court has jurisdiction over each defendant named herein because each defendant is either a corporation that conducts business in and maintains operations in this District, or is an individual who has sufficient minimum contacts with this District so as to render the exercise of jurisdiction by the courts of this District permissible under traditional notions of fair play and substantial justice.

29.    Venue is proper in this Court under 28 U.S.C. §1391(b) because: (i) J&J is incorporated in and maintains its executive offices and principal place of business in this District; (ii) one or more of the defendants either resides in or maintains offices in this District; (iii) a substantial portion of the transactions and wrongs complained of herein, including the defendants' primary participation in the wrongful acts detailed herein, and aiding and abetting and conspiracy in violation of fiduciary duties owed to

J&J, occurred in this District; and (iv) defendants have received substantial compensation in this District by doing business here and engaging in numerous activities that had an effect in this District.

## THE PARTIES

30.    Plaintiffs Wollman, Heimowitz, Diamond and Cafaro are J&J shareholders and have been continuously since 1998, 1996,  1982 and prior to 1997, respectively.  Plaintiffs will fairly and adequately represent J&J's interests in this litigation.  Plaintiffs Wollman, Heimowitz, Diamond and Cafaro are citizens of the States of Maryland, New York, California and Florida, respectively.

31.    Nominal defendant J&J is a New Jersey corporation, with its executive offices located at One Johnson & Johnson Plaza, New Brunswick, New Jersey 08933. J&J has approximately 114,000 employees worldwide engaged in the research and development, and the manufacture and sale of consumer products, pharmaceuticals and medical devices.  At all relevant times J&J conducted significant business and commerce in Greece, Poland, Romania and Iraq.  Due to its extensive overseas operations, J&J was, at all relevant times, subject to the books and records and anti-bribery provisions of the FCPA.  J&J is a citizen of the State of New Jersey.

32.    Defendant Coleman has been a J&J director since 2003.  She also served on the Audit Committee.  Due to J&J's extensive overseas operations, defendant Coleman knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business.  Defendant

- 11 -

Coleman also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  Directors of publicly traded companies are generally presumed to know that they have a duty to operate the corporation lawfully and in accordance with the statutory laws applicable to its business.  Therefore, defendant Coleman owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq.  But defendant Coleman did not discharge her fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to win contracts in Iraq flourished.  Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there.  By signing J&J's 2006-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2007-2011 Proxy Statements, defendant Coleman breached her fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and

- 12 -

misleading statements to J&J shareholders.  Defendant Coleman is a citizen of the State of Colorado.

33.     Defendant Cullen has been a J&J director since 1995.  He also served as Chairman of the Audit Committee.  In addition to the J&J Board, defendant Cullen also serves or served on the boards of directors of Bell Atlantic Corporation, Agilent Technologies, Inc., NeuStar, Inc. and Prudential Financial, Inc.  Due to J&J's extensive overseas operations, defendant Cullen knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business.  Defendant Cullen also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  Directors of publicly traded companies are generally presumed to know that they have a duty to operate the corporation lawfully and in accordance with the statutory laws applicable to its business.  Therefore, defendant Cullen owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq. But defendant Cullen did not discharge his fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to win contracts in Iraq flourished.  Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants

645771_1

steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there. By signing J&J's 2006-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2007-2011 Proxy Statements, defendant Cullen breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders.  Defendant Cullen is a citizen of the State of New Jersey.

34.    Defendant Davis has been a J&J director since July 2010.  He also served on the Audit Committee.  Due to J&J's extensive overseas operations, defendant Davis knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business.  Defendant Davis also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  After joining the J&J Board in July 2010, defendant Davis joined his colleagues in steadfastly concealing the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  J&J's shareholder reports and SEC

- 14 -

filings were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there. By signing J&J's 2010 Annual Report on SEC Form 10-K and issuing J&J's 2011 Proxy Statement, defendant Davis breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders. Defendant Davis is a citizen of the United Kingdom.

35. Defendant Johns has been a J&J director since 2005. Due to J&J's extensive overseas operations, defendant Johns knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business. Defendant Johns also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments. Directors of publicly traded companies are generally presumed to know that they have a duty to operate the corporation lawfully and in accordance with the statutory laws applicable to its business. Therefore, defendant Johns owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq. But defendant Johns did not discharge his fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to

win contracts in Iraq flourished.  Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there. By issuing J&J's 2007-2010 Annual Reports on SEC Form 10-K and J&J's 2007-2011 Proxy Statements, defendant Johns breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders.  Defendant Johns is a citizen of the State of Georgia.

36.    Defendant Lindquist has been a J&J director since 2004.  She also served on the Public Policy Advisory Committee.   Due to J&J's extensive overseas operations, defendant Lindquist knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business.  Defendant Lindquist also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  Directors of publicly traded companies are generally

presumed to know that they have a duty to operate the corporation lawfully and in accordance with the statutory laws applicable to its business. Therefore, defendant Lindquist owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq. But defendant Lindquist did not discharge her fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to win contracts in Iraq flourished. Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011. Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there. By signing J&J's 2006-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2007-2011 Proxy Statements, defendant Lindquist breached her fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders. Defendant Lindquist is a citizen of the State of Massachusetts.

37.     Defendant Mulcahy has been a J&J director since 2009. In addition to the J&J Board, defendant Mulcahy also serves or served on the boards of directors of Xerox Corporation, Target Corporation, The Washington Post Company, Citigroup

- 17 -

Inc. and Federal National Mortgage Association.  Due to J&J's extensive overseas operations, defendant Mulcahy knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business.  Defendant Mulcahy also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  After joining the J&J Board in 2009, defendant Mulcahy joined her colleagues in steadfastly concealing the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  J&J's shareholder reports and filings were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business.  By signing J&J's 2009-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2010-2011 Proxy Statements, defendant Mulcahy breached her fiduciary duty of loyalty (and candor and good faith) and the federal securities laws by making false and misleading statements to J&J shareholders.  Defendant Mulcahy is a citizen of the State of Connecticut.

  38. Defendant Mullin has been a J&J director since 1999.  He also served on the Audit Committee.  In addition to the J&J Board, defendant Mullin also serves or served on the boards of directors of Delta Air Lines, Inc., ACE Limited, Education

Management Corporation and Bell South Corporation. Due to J&J's extensive overseas operations, defendant Mullin knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business. Defendant Mullin also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments. Directors of publicly traded companies are generally presumed to know that they have a duty to operate the corporation lawfully and in accordance with the statutory laws applicable to its business. Therefore, defendant Mullin owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq. But defendant Mullin did not discharge his fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to win contracts in Iraq flourished. Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011. Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there.

- 19 -

By signing J&J's 2006-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2007-2011 Proxy Statements, defendant Mullin breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders.  Defendant Mullin is a citizen of the State of Georgia.

39.     Defendant Perez has been a J&J director since 2007.  In addition to the J&J Board, defendant Perez also serves or served on the boards of directors of Wm. Wrigley Jr. Company, Campbell Soup Company, Whirlpool Corporation, Kellogg Company and Nike, Inc.  Due to J&J's extensive overseas operations, defendant Perez knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business.  Defendant Perez also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  After joining the J&J Board in 2007, defendant Perez joined his colleagues in steadfastly concealing the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  J&J's shareholder reports and filings issued between mid-2007 and March 2011 were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain

business there.  By signing J&J's 2007-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2008-2011 Proxy Statements, defendant Perez breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders.  Defendant Perez is a citizen of the State of Wisconsin.

40.     Defendant Prince has been a J&J director since 2006.  In addition to the J&J Board, defendant Prince also serves or served on the boards of directors of Citigroup Inc. and Xerox Corporation.  Due to J&J's extensive overseas operations, defendant Prince knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business. Defendant Prince also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  Directors of publicly traded companies are generally presumed to know that they have a duty to operate the corporation lawfully and in accordance with the statutory laws applicable to its business.  Therefore, defendant Prince owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq.  But defendant Prince did not discharge his fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to win contracts in Iraq

- 21 -

flourished.  Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011. Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there.  By signing J&J's 2006-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2007-2011 Proxy Statements, defendant Prince breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders.  Defendant Prince is a citizen of the State of New York.

41.     Defendant Satcher has been a J&J director since 2002.  Due to J&J's extensive overseas operations, defendant Satcher knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to get or retain business.  Defendant Satcher also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  Directors of publicly traded companies are generally presumed to know that they have a duty to operate the corporation lawfully

- 22 -

and in accordance with the statutory laws applicable to its business.  Therefore, defendant Satcher owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq. But defendant Satcher did not discharge his fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to win contracts in Iraq flourished.  Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there. By signing J&J's 2006-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2007-2011 Proxy Statements, defendant Satcher breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making false and misleading statements to J&J shareholders.  Defendant Satcher is a citizen of the State of Georgia.

42.    Defendant Weldon has been a member of the J&J Board and J&J's Chairman and Chief Executive Officer ("CEO") since 2001.  Due to J&J's extensive overseas operations, defendant Weldon knew, at all relevant times, that J&J was subject to the FCPA, which bars publicly traded companies from bribing officials to

get or retain business.  Defendant Weldon also knew that, under the FCPA's books and records provisions, J&J had to implement an internal controls system to prevent bribes and kickbacks from occurring at its operations, and particularly those located in high-risk, emerging markets where the cultures do not discourage requests for bribes, kickbacks and other improper payments.  Directors of publicly traded companies are generally presumed to know that they have a duty to operate the corporation lawfully and in accordance with the statutory laws applicable to its business.  Therefore, defendant Weldon owed J&J a duty of loyalty to implement controls for compliance with the FCPA at J&J's overseas operations in Greece, Poland, Romania and Iraq.  But defendant Weldon did not discharge his fiduciary duty of loyalty to implement such FCPA-compliant controls, and bribery of doctors in Europe and illegal kickbacks to win contracts in Iraq flourished.  Although the Company purportedly informed the authorities of the bribery and kickback scheme in February 2007, defendants steadfastly concealed the details surrounding the FCPA violations at J&J's European subsidiaries until April 2011.  Accordingly, J&J's shareholder reports and SEC filings issued before then were materially false and misleading because they concealed the details concerning the widespread bribery of doctors and administrators in Greece, Poland and Romania, and illegal kickbacks to officials in Iraq to obtain business there.  By signing J&J's 2006-2010 Annual Reports on SEC Form 10-K and issuing J&J's 2007-2011 Proxy Statements, defendant Weldon breached his fiduciary duty of loyalty (and candor and good faith) and violated the federal securities laws by making

false and misleading statements to J&J shareholders.  Defendant Weldon is a citizen of the State of Pennsylvania.

## THE FIDUCIARY DUTIES OF J&J'S BOARD OF DIRECTORS

43.     The directors of a corporation are responsible for managing its affairs. They owe the corporation an unremitting duty of loyalty and, therefore, must fulfill those functions lawfully and in accordance with the statutes, rules and regulations applicable to its business.  When faced with a known duty to act, such as in the case of requiring the corporation to comply with federal laws, directors who fail to cause the corporation to act breach their duty of loyalty and may be held liable to the corporation for damages.

44.     As fiduciaries, corporate directors must protect the corporation's assets and property against losses, whether actual or threatened.  They must avoid avoidable losses to the corporation whenever possible or reasonable to do so.  This includes, among other things, causing the corporation to implement business practices and internal controls called for by federal statutes applicable to the corporation's business.

45.     Directors also owe the corporation and its shareholders a duty of candor. Whenever directors choose to speak on behalf of the corporation, they have a duty to speak the complete, full and unvarnished truth.  Directors who make false and misleading statements in the corporation's shareholder reports and/or SEC filings act disloyally and may be held liable to the corporation.

- 25 -

## AIDING AND ABETTING

46.     In committing the wrongful acts and violations of law detailed herein, defendants have pursued or joined in the pursuit of a common course of conduct, and have acted in concert with one another in furtherance of their common plan or design. In addition to the wrongful conduct particularized herein as giving rise to primary liability, defendants further aided and abetted and/or assisted each other in breaching their fiduciary duties and violating their legal obligations owed to J&J.

47.     Additionally, each of the defendants aided and abetted and rendered substantial assistance to others in the wrongs detailed herein.  In taking such actions to substantially assist the commission of the wrongdoing detailed herein, each defendant acted with knowledge of the primary wrongdoing, substantially assisted the accomplishment of that wrongdoing and was aware of his or her overall contribution to and furtherance of the wrongdoing.

## FACTUAL ALLEGATIONS

48.     J&J is a global consumer product, pharmaceutical and medical devices company.  It has approximately 114,000 employees worldwide, and operates extensively overseas in high-risk markets where the legal and regulatory systems are less developed and/or the cultures do not discourage requests for bribes, kickbacks and other illicit payments.  At the Company's operations in Greece, Poland, Romania and Iraq, J&J routinely worked with doctors and administrators affiliated with state-run hospital systems and other governmental entities.

- 26 -

49.     Although J&J purportedly had a policy regarding illicit payments to officials in other countries, the Company did not have an internal controls system for compliance with the books and records and anti-bribery provisions of the FCPA in Greece, Poland, Romania and Iraq.  Under their fiduciary duty of loyalty, the J&J Board was responsible for causing the Company to implement controls for compliance with the FCPA.  However, as the SEC determined, J&J violated the FCPA because it did not have an internal controls system for detecting and preventing bribes to public doctors in Europe and kickbacks to officials in Iraq to obtain business there.

**Defendants' Knowledge of the FCPA**

50.     At all relevant times, defendants knew that, due to J&J's extensive overseas operations, the FCPA, including its anti-bribery and books and records provisions, applied to J&J's business.  Their knowledge of the FCPA and its application to J&J stem from a myriad of sources.  For example, the vigorous enforcement of the FCPA has been a well-publicized, top priority for the U.S. Government since its enactment into law by Congress in 1977.  Since the terrorist attacks of September 11, 2001, the SEC and DOJ's enforcement of the FCPA has only intensified.  SEC and DOJ enforcement actions, large FCPA settlements and countless media reports in the financial and healthcare press regarding the FCPA, all alerted defendants to the importance of and need to secure J&J's full compliance with the FCPA.

51.     Defendants' knowledge of the FCPA and its requirements is also illustrated by the fact that several defendants were specifically recommended for election, or re-election, to the J&J Board because of their international business acumen.  For example, J&J's 2011 Proxy Statement states that defendant Davis was nominated to the J&J Board because "[h]aving served as Chairman and Worldwide Managing Director of one of the world's leading management consulting firms, and as a consultant to a range of global organizations across the public, private and not-for-profit sectors, Mr. Davis brings considerable global experience, management insight and business knowledge to the Company's Board."

52.     Similarly, J&J's 2011 Proxy Statement states that "Mr. Mullin's depth and breadth of exposure to complex issues from having served as Chairman and CEO of one of the nation's largest airlines, and his long and distinguished career in the banking industry, make him a skilled advisor who provides critical insight into organizational and operational management, global business and financial matters."

53.     Likewise, J&J's 2011 Proxy Statement states that defendant Perez was nominated to serve on the J&J Board because, "[w]ith his experience as CEO of several large, consumer-focused companies across a wide variety of industries, Mr. Perez contributes to the Company's Board significant organizational and operational management skills, combined with a wealth of experience in global, consumer-oriented businesses vital to a large public company in the consumer products space."

54.     Further, J&J's 2011 Proxy Statement states that defendant Prince was nominated to the J&J Board because "[h]aving served as Chairman and CEO of the nation's largest and most diversified financial institution, Mr. Prince brings to the Company's Board a strong mix of organizational and operational management skills combined with well-developed legal, global business and financial acumen critical to a large public company."

55.     Defendants' awareness of the FCPA's prohibition on bribing officials in other countries also springs from most Americans' shared belief that bribery is simply wrong.  This common-sense notion permeates our Nation's corporate laws, which presume that corporate directors are aware and conscious of their duty to manage the corporation lawfully and in accordance with the laws applicable to its business.  To underscore the United States' anti-bribery bias, Congress enacted the FCPA to ensure that publicly traded companies put in place internal control systems designed to detect and prevent bribery.  So, just as with U.S. securities and tax laws, defendants were, at all relevant times, conscious of the FCPA's anti-bribery and books and records provisions, and their fiduciary duty to implement the FCPA at J&J's operations.

**J&J's Foreign Bribery Scheme**

56.     During the 2000s, J&J's business grew rapidly, especially overseas in high-risk, emerging markets such as Greece, Poland, Romania and Iraq.  J&J's total international sales increased from $11.8 billion in 2000 to $53.3 billion in 2006.  Total

corporate profits also grew, increasing from $4.7 billion in 2000 to $11 billion in 2006.

57.     Propelled by these positive results, J&J's stock price dramatically increased, rising from approximately $52.53 per share in 2000 to approximately $66.02 per share in 2006.   Many defendants received valuable stock-based compensation from J&J during this time period.  As J&J's share price increased, so did the value of defendants' personal J&J holdings.

58.     J&J's financial gains were not entirely the product of honest labor, however.  For years, J&J engaged in a wide-ranging effort to bribe doctors and administrators at state-run hospital systems in Greece, Poland and Romania, and pay kickbacks to officials in Iraq.

59.     In Greece, J&J secretly paid bribes to doctors at state-run hospitals to purchase J&J's surgical implants.  Specifically, after an extensive investigation, the SEC found:

> Rather than cease the bribery that was happening at DePuy prior to J&J's acquisition, J&J through its subsidiaries, employees and agents allowed the bribery to continue.  They created sham businesses and entered into contracts that were merely conduits to allow the bribery to flourish.  They failed to conduct due diligence on the Greek Distributor. The Company also paid its consultant outside of Greece to avoid detection of bribery.  The Company had two different J&J corporate entities make payments to the Greek Agent to conceal the amount of money that was being funneled to doctors as bribes.

60.     In Poland, J&J secretly bribed doctors and administrators at hospitals in exchange for purchasing J&J products or awarding hospital tenders.  J&J disguised

- 30 -

the bribes as "civil contracts," purportedly for lectures, workshops or to conduct

clinical trials, but never asked its sales representatives for proof the services were

performed.  Specifically, after an extensive investigation, the SEC found:

> [J&J's subsidiary] created sham civil contracts with publicly-employed doctors and hospital administrators to pay them for using J&J's medical devices or for influencing hospitals to award medical device tenders to [J&J's subsidiary] MD&D Poland.  Although the contracts called for services, the doctors would not provide any, and MD&D Poland would pay the doctors based on fictitious activities.

> Approximately $775,000 of improper civil contract payments were funneled to public doctors from at least January 1, 2000 to June 30, 2006.

> *       *       *

> MD&D Poland also paid for public doctors and hospital administrators to travel to medical conventions in Poland and abroad in order to influence tender committee decisions in their favor.  Sponsored doctors were taken on trips in exchange for influencing the doctors' decisions to purchase J&J's medical products or to award hospital tenders to J&J.

> *       *       *

[In total, J&J's subsidiary] spent approximately $7.6 million on these travel sponsorships between 2000 and 2006 that were rolled into the books of J&J with an indeterminate amount as bribes due to insufficient records.

61.     In Romania, the bribes were more straightforward.  J&J secretly "worked

with . . . distributors to deliver [envelopes of] cash" to public doctors and pharmacists

in exchange for prescriptions, usually between 3% and 5% of the sales value.

Specifically, after an extensive investigation, the SEC found:

[J&J's subsidiary in Romania] bribed publicly-employed doctors and pharmacists to prescribe J&J products that the company was actively promoting (the "Promoted Products"). The employees worked with [J&J subsidiary] Pharma Romania's local distributors to deliver cash to publicly-employed doctors who ordered J&J drugs for their patients. Pharma Romania also provided travel to certain doctors who agreed to prescribe J&J products. [In total,] [f]rom 2000 to 2007, J&J earned $3,515,500 in profit from its sales through the bribery.

62.     J&J also secretly paid kickbacks in Iraq for 19 contracts under the United Nations' Oil-for-Food program. Specifically, after an extensive investigation, the SEC found:

J&J participated in the [Oil-for-Food] Program through two of its subsidiaries, Cilog AG International and Janssen Pharmaceutica N.V. (collectively "Janssen-Cilag"). During the program, Janssen-Cilag sold pharmaceuticals to an arm of the Iraqi Ministry of Health known as Kimadia. Janssen-Cilag conducted business with Kimadia in Iraq through a Lebanese agent (the "Agent").

\*      \*      \*

In total, secret kickback payments of approximately $857,387 were made in connection with nineteen Oil for Food contracts. The payments were made through the Agent to Iraqi controlled accounts in order to avoid detection by the U.N. The fee was effectively a bribe paid to the Iraqi regime, which were disguised on J&J's books and records by mischaracterizing the bribes as legitimate commissions.

. . . J&J's total profits on the contracts were $6,106,255.

63.     Collectively, J&J earned over $24 million in profits by bribing Greek doctors to buy surgical implants, including artificial knees and hips. The Company earned $4.3 million in Poland as a result of bribes, and another $3.5 million through

- 32 -

illegal rewards in Romania.  J&J also made $6.1 million in profits by paying kickbacks to officials in Iraq to win business there.

64.     In April 2010, the judge overseeing the corruption trial of a former J&J executive held "[c]orruption was, in effect, a company policy . . . [and] was systemic and long-term."  A year later, in April 2011, the SEC similarly found that "'J&J chose profit margins over compliance,'" as a result, "J&J failed to implement internal controls to detect or prevent bribery."

**J&J's Record-Setting FCPA Settlement**

65.     Defendants succeeded in concealing the breathtaking scope of J&J's bribery scheme until April 2011.  Then, on April 7-8, 2011, the SEC and DOJ announced that J&J had admitted to engaging in a scheme to bribe doctors in Europe and pay kickbacks to officials in Iraq, to resolve federal FCPA enforcement actions against J&J.  The U.S. Government also revealed that J&J had agreed to pay $70 million in disgorgement, interest and fines, in addition to entering into a costly-to-administer deferred prosecution agreement with the DOJ.

66.     In particular, J&J agreed to pay $48.6 million in disgorgement and interest to settle the SEC claims and a $21.4 million fine to settle charges brought by the DOJ.  Under the deferred prosecution agreement, J&J admitted to bribing doctors in Europe and agreed to report on remediation and compliance measures every six months for three years.  According to news reports, J&J's FCPA settlement is the

tenth-largest settlement of its type, and the second-largest FCPA settlement involving a U.S. corporation.

67.   Defendants' conscious failure to implement an internal controls system to detect and prevent bribes and kickbacks in Greece, Poland, Romania and Iraq has severely damaged J&J and its business, goodwill and reputation.  The Company has and is likely to suffer additional damages while remediating the compliance violations discovered at the Company by the SEC and DOJ.

68.   As J&J's directors, defendants were responsible for causing J&J to implement the requirements of the FCPA at J&J's operations.  However, as the SEC concluded, J&J violated the FCPA because it did not have an internal controls system for detecting and preventing bribery at its subsidiaries in Greece, Poland, Romania and Iraq.

69.   As a result, the bribery schemes in these countries continued unabated for several years, without any internal controls to detect the bribes or provide a means for those individuals within the Company or with knowledge of the bribery schemes to bring the violations to light.  For example, as early as 1999, attorneys for J&J had knowledge of the bribes that were occurring in Greece and, as attorneys, were ethically bound to internally report the violations.  However, the fact that these violations continued for *seven more years* indicates no such system of internal controls existed to which the attorneys could have reported the violations.

70.     When faced with a known duty to act, directors must act to protect the corporation's assets and property.  Here, defendants breached their duty of loyalty by failing to implement internal controls for compliance with the FCPA at J&J's operations in Greece, Poland, Romania and Iraq.  Accordingly, defendants may be held liable to the Company for actual damages.

**J&J's False and Misleading Annual
Reports and Proxy Statements**

71.     Although J&J purportedly informed officials of its FCPA violations in February 2007, defendants concealed the true facts pertaining to J&J's FCPA violations until April 2011.  Even then, however, defendants still did not reveal the complicity of J&J's directors in the FCPA violations, although their conscious failure to implement the FCPA contributed significantly to the widespread bribery at J&J's overseas operations.  Instead, defendants concealed the operative facts concerning J&J's FCPA violations, as well as J&J's directors' culpability therein, in the Company's shareholder reports.

72.     For example, in J&J's 2006 Annual Report on SEC Form 10-K, dated February 21, 2007, defendants stated:

> On February 12, 2007, Johnson & Johnson voluntarily disclosed to the U.S. Department of Justice (DOJ) and the U.S. Securities and Exchange Commission (SEC) that subsidiaries outside the United States are believed to have made improper payments in connection with the sale of medical devices in two small-market countries, which payments may fall within the jurisdiction of the Foreign Corrupt Practices Act. The Company will provide additional information to DOJ and SEC, and will cooperate with the agencies' reviews of these matters.

- 35 -

73.     Similarly, in J&J's 2007 Annual Report on SEC Form 10-K, dated February 26, 2008, to further conceal the operative facts about the FCPA violations at the Company's overseas operations, as well as J&J's directors' culpability therein for consciously failing to implement FCPA controls, defendants stated:

>       In February 2007, Johnson & Johnson voluntarily disclosed to the DOJ and the SEC that subsidiaries outside the United States are believed to have made improper payments in connection with the sale of medical devices in two small-market countries, which payments may fall within the jurisdiction of the Foreign Corrupt Practices Act (FCPA).  In the course of continuing dialogues with the agencies, other issues potentially rising to the level of FCPA violations in additional markets have been brought to the attention of the agencies by the Company.  The Company has provided and will continue to provide additional information to DOJ and SEC, and will cooperate with the agencies' reviews of these matters.

74.     Likewise, in J&J's 2008 Annual Report on SEC Form 10-K, dated February 20, 2009, to further conceal the operative facts about the FCPA violations at the Company's overseas operations, as well as J&J's directors' culpability therein for consciously failing to implement FCPA controls, defendants stated:

>       In February 2007, Johnson & Johnson voluntarily disclosed to the DOJ and the SEC that subsidiaries outside the United States are believed to have made improper payments in connection with the sale of medical devices in two small-market countries, which payments may fall within the jurisdiction of the Foreign Corrupt Practices Act (FCPA).  In the course of continuing dialogues with the agencies, other issues potentially rising to the level of FCPA violations in additional markets have been brought to the attention of the agencies by the Company.  The Company has provided and will continue to provide additional information to DOJ and SEC, and will cooperate with the agencies' reviews of these matters. Law enforcement agencies of a number of other countries are also pursuing investigations of matters voluntarily disclosed by the Company to DOJ and SEC.  Discussions are underway in an effort to resolve these

- 36 -

matters, and the Iraq Oil for Food matter referenced above, but whether agreement can be reached and on what terms is uncertain.

75.     Further, in J&J's 2009 Annual Report on SEC Form 10-K, dated March 1, 2010, to conceal the operative facts about the FCPA violations at J&J's overseas operations, as well as J&J's directors' culpability therein, defendants stated:

> In February 2007, the Company voluntarily disclosed to the DOJ and the SEC that subsidiaries outside the United States are believed to have made improper payments in connection with the sale of medical devices in two small-market countries, which payments may fall within the jurisdiction of the Foreign Corrupt Practices Act (FCPA). In the course of continuing dialogues with the agencies, other issues potentially rising to the level of FCPA violations in additional markets have been brought to the attention of the agencies by the Company. The Company has provided and will continue to provide additional information to the DOJ and SEC, and will cooperate with the agencies' reviews of these matters. Law enforcement agencies of a number of other countries are also pursuing investigations of matters voluntarily disclosed by the Company to the DOJ and SEC. Discussions are underway in an effort to resolve these matters, and the Iraq Oil for Food matter referenced above, but whether agreement can be reached and on what terms is uncertain.

76.     And, in J&J's 2010 Annual Report on SEC Form 10-K, dated February 25, 2011, to conceal the operative facts about J&J's FCPA violations, as well as J&J's directors' culpability therein for consciously failing to implement FCPA controls, defendants stated:

> In February 2007, the Company voluntarily disclosed to the DOJ and the SEC that subsidiaries outside the United States are believed to have made improper payments in connection with the sale of medical devices in two small-market countries, which payments may fall within the jurisdiction of the Foreign Corrupt Practices Act (FCPA). In the course of continuing dialogues with the agencies, other issues potentially rising to the level of FCPA violations in additional markets have been brought to the attention of the agencies by the Company. The Company

- 37 -

has provided and will continue to provide additional information to the DOJ and SEC, and will cooperate with the agencies' reviews of these matters. Law enforcement agencies of a number of other countries are also pursuing investigations of matters voluntarily disclosed by the Company to the DOJ and SEC. Discussions are underway in an effort to resolve these matters, and the Iraq Oil for Food matter referenced above, but whether agreement can be reached, and on what terms, is uncertain.

77.     To J&J's detriment, defendants never disclosed, as the SEC concluded, that for nearly a decade "J&J failed to implement internal controls to detect or prevent bribery," and that such "conduct was widespread in various markets, Greece, Poland, Romania, and Iraq." On the contrary, defendants concealed, among other things, that: (i) in Greece, J&J secretly paid bribes to doctors at state-run hospitals to purchase J&J's surgical implants; (ii) in Poland, J&J secretly bribed doctors and administrators at hospitals in exchange for purchasing J&J products or awarding hospital tenders; (iii) in Romania, J&J secretly bribed public doctors and pharmacists to prescribe J&J products that J&J was promoting; and (iv) in Iraq, J&J secretly paid kickbacks to officials to secure 19 contracts under the United Nations' Oil-for-Food program.

78.     Defendants' failure to implement such an internal controls system resulted, among other things, in materially false and misleading financial statements being filed with the SEC and disseminated to the public, including the Company's shareholders. The deferred prosecution agreement with the DOJ set forth various facts which J&J admits are "true and correct," most of which are also contained in the complaint filed by the SEC. In addition to admitting the factual allegations are true, J&J has "expressly agree[d] that it shall not, through present or future attorneys,

directors, officers, employees, agent, or any other person authorized to speak for J&J make any public statement, in litigation or otherwise, contradicting" the following facts, among others:

> In order to conceal the payments to the Greek, Polish, and Romanian [health care providers] on the books and records of J&J and its subsidiaries, the payments were misrepresented as, among other things, "commissions," "civil contracts," "travel," "donations," and "discounts."

> In order to conceal the kickback payments made to the Iraqi government . . . for contracts under the [Oil for Food Program] on the books and records of Janssen and Cilag, the payments were misrepresented as "commissions."

> At the end of J&J's fiscal year from in or around 1998 to in or around 2007, the books and records of DePuy International, DuPuy Hellas, J&J Poland, J&J Romania, Janssen, and Cilag, including those containing false characterizations of kickbacks and bribe payments given to the Iraqi government and Greek, Polish, and Romanian officials, were incorporated into the books and records of J&J for purposes of preparing J&J's year-end financial statements, which were filed with the Securities and Exchange Commission in Washington D.C.

79. Defendants owed J&J a duty of candor. Whenever they spoke on J&J's behalf, defendants had a duty to speak the complete, full and unvarnished truth. However, as demonstrated above, defendants breached this duty when they issued J&J's Annual Reports on SEC Form 10-K to J&J shareholders without disclosing the adverse, material non-public facts about the FCPA set forth above in ¶¶77-78. The issuers of J&J's false and misleading 2006-2010 Annual Reports are set forth below:

| Date | Report | Authors |
|------|--------|---------|
| 02/21/07 | 2006 Annual Report | Defendants Coleman, Cullen, Lindquist, Mullin, Prince, Satcher and Weldon |
| 02/26/08 | 2007 Annual Report | Defendants Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, Satcher and Weldon |
| 02/20/09 | 2008 Annual Report | Defendants Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, Satcher and Weldon |
| 03/01/10 | 2009 Annual Report | Defendants Coleman, Cullen, Johns, Lindquist, Mulcahy, Mullin, Perez, Prince, Satcher and Weldon |
| 02/25/11 | 2010 Annual Report | Defendants Coleman, Cullen, Davis, Johns, Lindquist, Mulcahy, Mullin, Perez, Prince, Satcher and Weldon |

80.     Between 2007 and 2011, defendants also used J&J's Proxy Statements to conceal the operative facts concerning the FCPA violations at J&J's overseas operations, as well as J&J's directors' culpability therein for consciously failing to implement FCPA controls.  Consequently, J&J's Proxy Statements for 2007-2011 never disclosed that for nearly a decade "J&J failed to implement internal controls to detect or prevent bribery," and that such "conduct was widespread in various markets, Greece, Poland, Romania, and Iraq."  Nor did the Proxy Statements disclose that: (i) in Greece, J&J secretly paid bribes to doctors at state-run hospitals to purchase J&J's surgical implants; (ii) in Poland, J&J secretly bribed doctors and administrators at hospitals in exchange for purchasing J&J products or awarding hospital tenders; (iii) in Romania, J&J secretly bribed public doctors and pharmacists to prescribe J&J products that J&J was promoting; and (iv) in Iraq, J&J secretly paid kickbacks to officials to secure 19 contracts under the United Nations' Oil-for-Food program.

- 40 -

81.   J&J's false and misleading Proxy Statements also regularly sought the election, or re-election, of defendants to the J&J Board.  Although J&J's Proxy Statements for 2007-2011 contained biographical and other information about each defendant and his/or her qualifications for service on the J&J Board, the Proxy Statements did not disclose any of the adverse, material non-public facts set forth above in ¶¶77-78.   Instead, the Proxy Statements routinely recommended that defendants be elected, or re-elected, to the J&J Board, and each year they were elected or re-elected to the J&J Board.

82.   Had the true facts pertaining to J&J's FCPA violations been known, including J&J's directors' complicity in them for consciously failing to implement the FCPA at J&J's overseas operations, defendants would not have been elected or re-elected to the J&J Board.   Defendants violated §14(a) of the Exchange Act by disseminating false and misleading Proxy Statements to J&J shareholders between 2007 and 2011.  In doing so, defendants also breached their fiduciary duty of candor.

83.   The false and misleading Proxy Statements, along with the defendants responsible for their publication, are set forth below:

| *Date* | *Report* | *Authors* |
|---|---|---|
| 03/14/07 | 2007 Proxy Statement | Defendants Coleman, Cullen, Johns, Lindquist, Mullin, Prince, Satcher and Weldon |
| 03/12/08 | 2008 Proxy Statement | Defendants Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, Satcher and Weldon |
| 03/11/09 | 2009 Proxy Statement | Defendants Coleman, Cullen, Johns, Lindquist, Mullin, Perez, Prince, Satcher and Weldon |

| Date | Report | Authors |
|------|--------|---------|
| 03/17/10 | 2010 Proxy Statement | Defendants Coleman, Cullen, Johns, Lindquist, Mulcahy, Mullin, Perez, Prince, Satcher and Weldon |
| 03/16/11 | 2011 Proxy Statement | Defendants Coleman, Cullen, Davis, Johns, Lindquist, Mulcahy, Mullin, Perez, Prince, Satcher and Weldon |

## DAMAGES TO J&J

84.     J&J business, and its goodwill and reputation have been badly damaged by the long-running bribery scheme at the Company's subsidiaries in Greece, Poland and Romania, and the kickbacks to Iraq.  On April 7, 2011, J&J agreed to pay $70 million to resolve FCPA enforcement actions brought by the SEC and DOJ – the tenth-largest FCPA settlement in history.

85.     Notably, however, the $70 million settlement does not include the tens of millions of dollars in damages stemming from investigative costs and expenses already incurred by the Company or its costs, including legal fees, incurred in defending the SEC and DOJ investigations.  Nor does the settlement figure include the Company's damages arising from remediation costs incurred by J&J to implement internal controls at its subsidiaries in Greece, Poland and Romania, and/or the damages to J&J's goodwill and reputation arising from the foreign bribery scheme and huge FCPA settlement.

86.     Although J&J has suffered substantial damage, defendants have not fared nearly so badly.  While J&J was engaged in a widespread bribery scheme which

- 42 -

temporarily benefited the Company's bottom line, defendants collectively pocketed more than $42.7 million in incentive compensations and fees that were not justified in light of the rampant lawlessness that occurred at J&J's European subsidiaries while under defendants' stewardship.

87.    Nevertheless, the J&J Board has not commenced legal action or taken other steps against defendants for their failure to implement internal controls and systems for compliance with the FCPA's books and records provisions at the Company's operations in Greece, Poland and Romania.  By this action, plaintiffs seek to vindicate J&J's rights against its wayward fiduciaries.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

88.    Plaintiffs incorporate ¶¶1-87.

89.    Pursuant to Rule 23.1 of the Federal Rules of Civil Procedure, plaintiffs bring this action for the benefit of J&J to redress injuries suffered, and to be suffered, by J&J as a result of defendants' misconduct.

90.    Plaintiffs properly commenced this action without making a pre-suit demand upon the J&J Board.  Each member of the J&J Board is compromised from fairly evaluating the derivative claims, let alone vigorously prosecuting them, because they are each responsible for damages suffered by J&J as a result of the FCPA debacle at the Company's operations in Europe and Iraq, and for making false and misleading statements to J&J shareholders after the J&J Board had determined that J&J had likely

- 43 -

violated the FCPA.  Accordingly, a pre-suit demand upon the J&J Board is a useless and futile action, and therefore, excused.

91.     Specifically, a pre-suit demand is excused because the entire J&J Board breached its fiduciary duty of loyalty by failing to cause J&J to implement an internal controls system for compliance with the FCPA at J&J's operations in Greece, Poland, Romania and Iraq.  As a result, bribery of officials to obtain or retain business flourished in those markets.  Defendants were aware that the FCPA's books and record provisions required J&J to have an internal controls system to detect and prevent bribery.  Nevertheless, defendants did not cause J&J to put such internal controls in place, and, as a result, breached their duty of loyalty to J&J.  Defendants' utter failure to act when faced with a known duty to act cannot be indemnified by J&J.  As a result, defendants face substantial likelihood of liability and therefore, a pre-suit demand on the J&J Board is excused.

92.     Moreover, aside from not being disinterested and independent, the Board already has stated wrongfully and unreasonably that it will reject and seek to dismiss the causes of action brought by the plaintiffs on the Company's behalf.

93.     The investigation by the Special Committee, upon which the Board purports to rely, was not conducted in good faith, and as a result, the Special Committee report was flawed and incomplete.  Members of the Special Committee were not interested in conducting a thorough investigation because they suffered from a debilitating conflict of interest and were primarily concerned with relieving

- 44 -

themselves of any potential liability.  Indeed, only a small portion of the report actually addresses J&J's violations of the FCPA (and then only under an incorrect failure to supervise and inadequate controls theories).  The majority of the report focuses on other compliance issues in which J&J has been implicated, including its alleged violations of the False Claims Act, the Federal Anti-Kickback Statute and various Unites States Food and Drug Administration ("FDA") regulations.  The limited attention the report pays to the FCPA allegations demonstrates the extent to which the Special Committee failed to perform a thorough and focused investigation of plaintiffs' claims based on the FCPA.

94.     The Special Committee report, upon which the J&J Board purports to rely, contends that pursuing the claims underlying this action against defendants could create the risk that statements made by the Company or its representatives in this litigation could be deemed admissions and used in collateral litigation; require J&J to advance all the individual defendants' expenses (including legal fees), judgments, fines, penalties and settlements paid or reasonably incurred in this litigation; and require J&J to devote substantial time and resources to the litigation.  Thus, according to the Special Committee, even if this action was properly brought – which it was – prosecuting it would be detrimental to J&J's defenses in relation to the ongoing investigations and/or other actions.

95.     This and other extraneous factors considered by the Special Committee resulted in the creation of a biased and incomplete report, which lacked crucial details

concerning what controls for compliance with the books and records provisions of the FCPA, if any, were allegedly in place at J&J's operations in Greece, Poland, Romania and Iraq during the relevant period. For example, the Special Committee report concludes that, because an alleged email from a "whistleblower" in 2006 raised the issue of improper payments in Greece, the Company must have had sufficient internal controls for J&J's operations in Greece, Poland, Romania and Iraq. Despite the opportunity to do so, the report fails to bolster this conclusion with details regarding what FCPA controls were in place at the time in these countries. Considering the fact the FCPA violations occurred over a span of several years before the first "whistleblower" email was allegedly received, the facts in the report actually support the conclusion that no such FCPA complaint controls were in place in Greece, let alone in Poland, Romania and Iraq.

96. Moreover, the Special Committee's report inaccurately portrayed the complaints as having alleged "J&J had inadequate procedures" to prevent the bribery scheme and kickbacks, instead of the complaint's actual allegations regarding the Company's lack of controls for compliance with the FCPA in Greece, Poland, Romania and Iraq. The Special Committee's mischaracterization of the allegations contained in plaintiffs' shareholder derivative complaints illustrates the unreasonableness of the Special Committee's conclusions, and the Special Committee members' hostility toward the Company's causes of action and inability to present the allegations to the Board in an impartial manner. This mischaracterization by the

- 46 -

Special Committee ultimately prevented the Board from intelligently applying the relevant legal standards to the allegations.

97.     Moreover, the Special Committee and the Board have made clear they require an extremely unreasonable amount of evidence in order to allow the derivative claims to move forward.  Based on the Special Committee's recommendation, the Board has determined it will not pursue claims against two officers who the Special Committee found had knowledge of the FCPA violations in Greece and appear to have violated their fiduciary duties owed to J&J.  Thus, according to the Board, not even evidence of knowledge of the violations or breach of a fiduciary duty would suffice for the Board to allow the claims to proceed.

98.     Additionally, a pre-suit demand on defendant Weldon is excused because his primary employment is as CEO of J&J.  Between 2000 and 2006 alone, defendant Weldon pocketed more than $38.3 million in incentive compensation, including stock awards.  During this period, J&J lacked FCPA-compliant internal controls.  Therefore, defendant Weldon financially benefitted from the misconduct particularized in this Complaint and, therefore, is disabled from considering a pre-suit demand.

## COUNT I

### Against All Defendants for Breach of Fiduciary Duty of Loyalty (and Good Faith)

99.     Plaintiffs incorporate ¶¶1-98.

100.   Defendants owed J&J a fiduciary duty of loyalty (and good faith).  This duty includes an obligation, of which defendants were fully aware, to manage J&J's business and affairs lawfully and in accordance with the laws applicable to J&J's operations, including the FCPA's books and records and anti-bribery provisions.

101.   Defendants, however, did not have J&J implement an internal controls system for compliance with the FCPA's books and records provisions at J&J's operations in Greece, Poland, Romania and Iraq, and bribery flourished.  Defendants' failures to implement internal controls at J&J's overseas operations were conscious, and contrary to their fiduciary duty to act to implement internal controls at J&J's overseas operations.

102.   J&J has been severely injured by defendants' disloyal and faithless acts.  Accordingly, J&J should be awarded damages and equitable relief.

## COUNT II

### Against All Defendants for Breach of
### Fiduciary Duty of Loyalty (Candor)

103.   Plaintiffs incorporate ¶¶1-98.

104.   Defendants owed J&J a fiduciary duty to speak the full truth whenever they undertook to speak for J&J.  Defendants, however, breached their duty of candor when they disseminated materially false and misleading information to J&J shareholders about J&J's violations of the FCPA.  They also breached their duty of candor by concealing the fact that, although J&J's directors knew that J&J needed to

- 48 -

have internal controls for compliance with the FCPA at J&J's operations in Greece, Poland, Romania and Iraq, J&J's directors did not cause J&J to implement them.

105.   Defendants also did not correct their false and misleading statements in J&J's 2006-2010 Annual Reports on SEC Form 10-K and 2007-2011 Proxy Statements regarding the nature of, and responsibility for, the FCPA debacle at J&J. These actions were not a good faith exercise of business judgment to protect and promote J&J's legitimate corporate interests.

106.   J&J has been severely injured by defendants' disloyalty and lack of candor.  Accordingly, J&J should be awarded damages and equitable relief.

## COUNT III

### Against All Defendants for Mismanagement

107.   Plaintiffs incorporate ¶¶1-98.

108.   By causing J&J to operate without an internal controls system for compliance with the FCPA, defendants mismanaged J&J's business and affairs. Defendants were aware of the FCPA's ban on bribing officials in other countries to get or retain business.  They also knew that J&J needed to implement internal controls for compliance with the FCPA.  Instead, defendants mismanaged J&J's business by ignoring the Company's obligations under the FCPA.

109.   J&J has been severely injured by defendants' mismanagement. Accordingly, J&J should be awarded damages and equitable relief.

## COUNT IV

### Against All Defendants for Abuse of Control

110.   Plaintiffs incorporate ¶¶1-98.

111.   By causing J&J to operate without an internal controls system for compliance with the FCPA, defendants abused their control of J&J's business and affairs.  Defendants were aware of the FCPA's ban on bribing officials in other countries to get or retain business.  They also knew that J&J needed to implement internal controls for compliance with the FCPA.  Instead, defendants abused their control of J&J by ignoring the Company's obligations under the FCPA.

112.   J&J has been severely injured by defendants' abuse of control.  Accordingly, J&J should be awarded damages and equitable relief.

## COUNT V

### Against All Defendants for Corporate Waste

113.   Plaintiffs incorporate ¶¶1-98.

114.   While under the stewardship of J&J's directors, J&J violated the FCPA in Europe and Iraq and has been forced to, among other things, pay $70 million to resolve federal FCPA charges.  Additionally, J&J has and will incur tens of millions in additional damages in the form of FCPA investigative costs and remediation efforts.  Therefore, any temporary benefits that J&J may have obtained through bribery have been eclipsed by the damages arising from defendants' failure to cause J&J to

- 50 -

implement internal controls for compliance with the FCPA.  In short, defendants wasted J&J's valuable corporate assets.

115.   J&J has been severely injured by defendants' waste of corporate assets. Accordingly, J&J should be awarded damages and equitable relief.

## COUNT VI

### Against All Defendants for Unjust Enrichment

116.   Plaintiffs incorporate ¶¶1-98.

117.   Defendants have been unjustly enriched at the expense of and to the detriment of J&J.  While breaching their fiduciary duty, defendants received incentive compensation and fees from J&J that were not justified nor in the best interest of J&J.

118.   J&J has been severely injured by defendants' unjust enrichment. Accordingly, J&J should be awarded damages and equitable relief.

## COUNT VII

### Against Defendants for Violation of §14(a) of the Exchange Act

119.   Plaintiffs incorporate ¶¶1-98.

120.   Rule 14a-9, promulgated pursuant to §14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in

- 51 -

order to make the statements therein not false or misleading." 17 C.F.R. §240.14a-9(a).

121.   J&J's 2007-2011 Proxy Statements violated §14(a) and Rule 14a-9 because they omitted material facts, including details surrounding the events giving rise to J&J's violations of the FCPA, facts which most of the defendants were first aware of by no later than 2006.  In the exercise of reasonable care, defendants should have known that the Proxy Statements were materially false and misleading.

122.   The misrepresentation and omissions in the 2007-2011 Proxy Statements were material.  The Proxy Statements were an essential link in the accomplishment of the continuation of the unlawful foreign bribery scheme, as revelations of the truth would have immediately thwarted a continuation of J&J shareholders' endorsement of the directors' positions and/or executive compensation and fees.

123.   J&J has been severely injured by defendants' misconduct.  Accordingly, J&J should be awarded damages and equitable relief.

## COUNT VIII

### Against All Defendants for Violation of §29(b) of the Exchange Act

124.   Plaintiffs incorporate ¶¶1-98.

125.   Defendants each received incentive compensation and fees, including stock awards, while engaging in conduct that violates §14(a) of the Exchange Act. Defendants' incentive compensation and fees should be rescinded under §29 of the

Exchange Act because defendants violated §14 by issuing false and misleading reports to J&J shareholders regarding the nature of, and responsibility for, the FCPA violations at J&J's operations in Greece, Poland, Romania and Iraq.  All of the payments defendants received are therefore voidable by J&J under §29(b) of the Exchange Act.

126.   J&J is in privity with the defendants with respect to the incentive compensation and fees provided by J&J to defendants.  Defendants have engaged in prohibited conduct in violation of the securities laws as alleged herein.

127.   J&J has been severely injured by defendants' misconduct.  Accordingly, J&J is entitled to damages, *i.e.*, rescission of the incentive compensation and fees granted to defendants.

## PRAYER FOR RELIEF

WHEREFORE, plaintiffs demand judgment in favor of J&J against all defendants as follows:

A.      Declaring that plaintiffs may maintain this action on behalf of J&J and that plaintiffs are adequate representatives of J&J;

B.      Declaring that defendants have breached, among other things, their fiduciary duty of loyalty (and good faith and candor) owed to J&J, and violated the federal securities laws;

- 53 -

C.      Determining and awarding to J&J the damages sustained by it as a result of the breaches of fiduciary duty and securities laws violations set forth above from each of the defendants, jointly and severally, together with interest thereon;

D.      Determining and awarding to J&J exemplary damages in an amount necessary to punish defendants and to make an example of defendants to the community according to proof at trial;

E.      Awarding plaintiffs the costs and disbursements of this action, including reasonable attorneys' and experts' fees, costs and expenses; and

F.      Granting such other and further equitable relief as this Court may deem just and proper.

**JURY DEMAND**

Plaintiffs demand a trial by jury.

DATED:  August 29, 2011                    COHN LIFLAND PEARLMAN
                                             HERRMANN & KNOPF LLP
                                           PETER S. PEARLMAN


                                           _____
                                                *s/Peter S. Pearlman*
                                           PETER S. PEARLMAN

                                           Park 80 Plaza – West One
                                           250 Pehle Avenue, Suite 401
                                           Saddle Brook, NJ 07663
                                           Telephone:  201/845-9600
                                           201/845-9423 (fax)
                                           Email: psp@njlawfirm.com

- 54 -

ROBBINS GELLER RUDMAN
  & DOWD LLP
DARREN J. ROBBINS
TRAVIS E. DOWNS III
BENNY GOODMAN III
LAURIE L. LARGENT
CHRISTOPHER D. STEWART
655 West Broadway, Suite 1900
San Diego, CA  92101
Telephone:  619/231-1058
619/231-7423 (fax)

LAW OFFICE OF DEBRA S.
  GOODMAN P.C.
DEBRA S. GOODMAN
1301 Skippack Pike, Suite 7A#133
Blue Bell, PA  19422
Telephone:  610/277-6057
484/231-1922 (fax)

LAW OFFICE OF ALFRED G.
  YATES, JR., P.C.
ALFRED G. YATES, JR.
GERALD L. RUTLEDGE
519 Allegheny Building
429 Forbes Avenue
Pittsburgh, PA  15219
Telephone:  412/391-5164
412/471-1033 (fax)

Attorneys for Plaintiffs

- 55 -